# PROFFITT *v.* FLORIDA

No. 75–5706.  Argued March 31, 1976—Decided July 2, 1976

*Clinton A. Curtis* argued the cause for petitioner. With him on the brief was *Jack O. Johnson.*

*Robert L. Shevin,* Attorney General of Florida, argued the cause for respondent. With him on the brief were *A. S. Johnston, George R. Georgieff,* and *Raymond L. Marky,* Assistant Attorneys General.

*Solicitor General Bork* argued the cause for the United States as *amicus curiae.* With him on the brief was *Deputy Solicitor General Randolph. William E. James,* Assistant Attorney General, argued the cause for the State of California as *amicus curiae.* With him on the brief were *Evelle J. Younger,* Attorney General, and *Jack R. Winkler,* Chief Assistant Attorney General.*

Judgment of the Court, and opinion of MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS, announced by MR. JUSTICE POWELL.

The issue presented by this case is whether the imposition of the sentence of death for the crime of murder under the law of Florida violates the Eighth and Fourteenth Amendments.

I

The petitioner, Charles William Proffitt, was tried, found guilty, and sentenced to death for the first-degree

---

*Jack Greenberg, James M. Nabrit III, Peggy C. Davis,* and *Anthony G. Amsterdam* filed a brief for the N. A. A. C. P. Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal.

Briefs of *amici curiae* were filed by *Rollie R. Rogers* and *Lee J. Belstock* for the Colorado State Public Defender System, and by *Arthur M. Michaelson* for Amnesty International.

murder of Joel Medgebow. The circumstances surrounding the murder were testified to by the decedent's wife, who was present at the time it was committed. On July 10, 1973, Mrs. Medgebow awakened around 5 a. m. in the bedroom of her apartment to find her husband sitting up in bed, moaning. He was holding what she took to be a ruler.[1] Just then a third person jumped up, hit her several times with his fist, knocked her to the floor, and ran out of the house. It soon appeared that Medgebow had been fatally stabbed with a butcher knife. Mrs. Medgebow was not able to identify the attacker, although she was able to give a description of him.[2]

The petitioner's wife testified that on the night before the murder the petitioner had gone to work dressed in a white shirt and gray pants, and that he had returned at about 5:15 a. m. dressed in the same clothing but without shoes. She said that after a short conversation the petitioner had packed his clothes and departed. A young woman boarder, who overheard parts of the petitioner's conversation with his wife, testified that the petitioner had told his wife that he had stabbed and killed a man with a butcher knife while he was burglarizing a place, and that he had beaten a woman. One of the petitioner's coworkers testified that they had been drinking together until 3:30 or 3:45 on the morning of the murder and that the petitioner had then driven him home. He said that the petitioner at this time was wearing gray pants and a white shirt.

The jury found the defendant guilty as charged. Sub-

---

[1] It appears that the "ruler" was actually the murder weapon which Medgebow had pulled from his own chest.

[2] She described the attacker as wearing light pants and a pinstriped shirt with long sleeves rolled up to the elbow. She also stated that the attacker was a medium-sized white male.

sequently, as provided by Florida law, a separate hearing was held to determine whether the petitioner should be sentenced to death or to life imprisonment. Under the state law that decision turned on whether certain statutory aggravating circumstances surrounding the crime outweighed any statutory mitigating circumstances found to exist.[3] At that hearing it was shown that the petitioner had one prior conviction, a 1967 charge of breaking and entering. The State also introduced the testimony of the physician (Dr. Crumbley) at the jail where the petitioner had been held pending trial. He testified that the petitioner had come to him as a physician, and told him that he was concerned that he would harm other people in the future, that he had had an uncontrollable desire to kill that had already resulted in his killing one man, that this desire was building up again, and that he wanted psychiatric help so he would not kill again. Dr. Crumbley also testified that, in his opinion, the petitioner was dangerous and would be a danger to his fellow inmates if imprisoned, but that his condition could be treated successfully.

The jury returned an advisory verdict recommending the sentence of death. The trial judge ordered an independent psychiatric evaluation of the petitioner, the results of which indicated that the petitioner was not, then or at the time of the murder, mentally impaired. The judge then sentenced the petitioner to death. In his written findings supporting the sentence, the judge found as aggravating circumstances that (1) the murder was premeditated and occurred in the course of a felony (burglary); (2) the petitioner has the propensity to commit murder; (3) the murder was especially heinous, atrocious, and cruel; and (4) the petitioner knowingly, through his intentional act, created a great risk of serious

[3] See *infra*, at 248–250.

bodily harm and death to many persons. The judge also found specifically that none of the statutory mitigating circumstances existed. The Supreme Court of Florida affirmed. 315 So. 2d 461 (1975). We granted certiorari, 423 U. S. 1082 (1976), to consider whether the imposition of the death sentence in this case constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

## II

The petitioner argues that the imposition of the death penalty under any circumstances is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. We reject this argument for the reasons stated today in *Gregg* v. *Georgia, ante,* at 168–187.

## III

### A

In response to *Furman* v. *Georgia,* 408 U. S. 238 (1972), the Florida Legislature adopted new statutes that authorize the imposition of the death penalty on those convicted of first-degree murder. Fla. Stat. Ann. § 782.04 (1) (Supp. 1976–1977).[4] At the same time Florida

---

[4] The murder statute under which petitioner was convicted reads as follows:

"(1) (a) The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any arson, involuntary sexual battery, robbery, burglary, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb, or which resulted from the unlawful distribution of heroin by a person 18 years of age or older when such drug is proven to be the proximate cause of the death of the user, shall be murder in the first degree and shall constitute a capital felony, punishable as provided in s. 775.082.

"(b) In all cases under this section, the procedure set forth in

adopted a new capital-sentencing procedure, patterned in large part on the Model Penal Code. See § 921.141 (Supp. 1976–1977).[5] Under the new statute, if a defendant is found guilty of a capital offense, a separate evidentiary hearing is held before the trial judge and jury to determine his sentence. Evidence may be presented on any matter the judge deems relevant to sentencing and must include matters relating to certain legislatively specified aggravating and mitigating circumstances. Both the prosecution and the defense may present argument on whether the death penalty shall be imposed.

At the conclusion of the hearing the jury is directed to consider "[w]hether sufficient mitigating circumstances exist . . . which outweigh the aggravating circumstances found to exist; and . . . [b]ased on these considerations, whether the defendant should be sentenced to life [imprisonment] or death." §§ 921.141 (2)(b) and (c) (Supp. 1976–1977).[6] The jury's verdict is determined by

s. 921.141 shall be followed in order to determine sentence of death or life imprisonment." Fla. Stat. Ann. § 782.04 (Supp. 1976–1977).

Another Florida statute authorizes imposition of the death penalty upon conviction of sexual battery of a child under 12 years of age. § 794.011 (2) (Supp. 1976–1977). We do not in this opinion consider the constitutionality of the death penalty for any offense other than first-degree murder.

[5] See Model Penal Code § 210.6 (Proposed Official Draft, 1962) (set out in *Gregg* v. *Georgia, ante,* at 193–194, n. 44).

[6] The aggravating circumstances are:

"(a) The capital felony was committed by a person under sentence of imprisonment.

"(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

"(c) The defendant knowingly created a great risk of death to many persons.

"(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt

majority vote. It is only advisory; the actual sentence is determined by the trial judge. The Florida Supreme Court has stated, however, that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." *Tedder* v. *State,* 322 So. 2d 908, 910 (1975). Accord, *Thompson* v. *State,* 328 So. 2d 1, 5

---

to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

"(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

"(f) The capital felony was committed for pecuniary gain.

"(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

"(h) The capital felony was especially heinous, atrocious, or cruel." § 921.141 (5) (Supp. 1976–1977).

The mitigating circumstances are:

"(a) The defendant has no significant history of prior criminal activity.

"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(c) The victim was a participant in the defendant's conduct or consented to the act.

"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.

"(e) The defendant acted under extreme duress or under the substantial domination of another person.

"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"(g) The age of the defendant at the time of the crime." § 921.141 (6) (Supp. 1976–1977).

(1976). Cf. *Spinkellink* v. *State,* 313 So. 2d 666, 671 (1975).[7]

The trial judge is also directed to weigh the statutory aggravating and mitigating circumstances when he determines the sentence to be imposed on a defendant. The statute requires that if the trial court imposes a sentence of death, "it shall set forth in writing its findings upon which the sentence of death is based as to the facts: (a) [t]hat sufficient [statutory] aggravating circumstances exist . . . and (b) [t]hat there are insufficient [statutory] mitigating circumstances . . . to outweigh the aggravating circumstances." § 921.141 (3) (Supp. 1976–1977).[8]

The statute provides for automatic review by the Supreme Court of Florida of all cases in which a death sentence has been imposed. § 921.141 (4) (Supp. 1976–1977). The law differs from that of Georgia in that it does

---

[7] *Tedder* has not always been cited when the Florida court has considered a judge-imposed death sentence following a jury recommendation of life imprisonment. See, *e. g., Thompson* v. *State,* 328 So. 2d 1 (1976); *Douglas* v. *State,* 328 So. 2d 18 (1976); *Dobbert* v. *State,* 328 So. 2d 433 (1976). But in the latter case two judges relied on *Tedder* in separate opinions, one in support of reversing the death sentence and one in support of affirming it.

[8] In one case the Florida court upheld a death sentence where the trial judge had simply listed six aggravating factors as justification for the sentence he imposed. *Sawyer* v. *State,* 313 So. 2d 680 (1975). Since there were no mitigating factors, and since some of these aggravating factors arguably fell within the statutory categories, it is unclear whether the Florida court would uphold a death sentence that rested entirely on nonstatutory aggravating circumstances. It seems unlikely that it would do so, since the capital-sentencing statute explicitly provides that "[a]ggravating circumstances shall be *limited* to the following [eight specified factors]." § 921.141 (5) (Supp. 1976–1977). (Emphasis added.) There is no such limiting language introducing the list of statutory mitigating factors. See § 921.141 (6) (Supp. 1976–1977). See also n. 14, *infra.*

not require the court to conduct any specific form of review. Since, however, the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible, and the Supreme Court of Florida, like its Georgia counterpart, considers its function to be to "[guarantee] that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case. . . . If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great." *State* v. *Dixon*, 283 So. 2d 1, 10 (1973).

On their face these procedures, like those used in Georgia, appear to meet the constitutional deficiencies identified in *Furman*. The sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating factors against seven mitigating factors to determine whether the death penalty shall be imposed. This determination requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant. He must, *inter alia*, consider whether the defendant has a prior criminal record, whether the defendant acted under duress or under the influence of extreme mental or emotional disturbance, whether the defendant's role in the crime was that of a minor accomplice, and whether the defendant's youth argues in favor of a more lenient sentence than might otherwise be imposed. The trial judge must also determine whether the crime was committed in the course of one of several enumerated felonies, whether it was committed for pecuniary gain, whether it was committed to assist in an escape from custody or to prevent a lawful arrest, and whether the crime was especially heinous, atrocious, or cruel. To answer these questions, which are not un-

like those considered by a Georgia sentencing jury, see *Gregg* v. *Georgia, ante,* at 197, the sentencing judge must focus on the individual circumstances of each homicide and each defendant.

The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury.[9] This Court has pointed out that jury sentencing in a capital case can perform an important societal function, *Witherspoon* v. *Illinois,* 391 U. S. 510, 519 n. 15 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.[10]

The Florida capital-sentencing procedures thus seek to

---

[9] Because the trial judge imposes sentence, the Florida court has ruled that he may order preparation of a presentence investigation report to assist him in determining the appropriate sentence. See *Swan* v. *State,* 322 So. 2d 485, 488–489 (1975); *Songer* v. *State,* 322 So. 2d 481, 484 (1975). These reports frequently contain much information relevant to sentencing. See *Gregg* v. *Georgia, ante,* at 189 n. 37.

[10] See American Bar Association Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 1.1, Commentary, pp. 43–48 (Approved Draft 1968); President's Commission on Law Enforcement and Administration of Justice: The Challenge of Crime in a Free Society, Task Force Report: The Courts 26 (1967). See also *Gregg* v. *Georgia, ante,* at 189–192. In the words of the Florida court, "a trial judge with experience in the facts of criminality possesses the requisite knowledge to balance the facts of the case against the standard criminal activity which can only be developed by involvement with the trials of numerous defendants." *State* v. *Dixon,* 283 So. 2d 1, 8 (1973).

assure that the death penalty will not be imposed in an arbitrary or capricious manner. Moreover, to the extent that any risk to the contrary exists, it is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida "to determine independently whether the imposition of the ultimate penalty is warranted." *Songer* v. *State,* 322 So. 2d 481, 484 (1975). See also *Sullivan* v. *State,* 303 So. 2d 632, 637 (1974). The Supreme Court of Florida, like that of Georgia, has not hesitated to vacate a death sentence when it has determined that the sentence should not have been imposed. Indeed, it has vacated 8 of the 21 death sentences that it has reviewed to date. See *Taylor* v. *State,* 294 So. 2d 648 (1974); *Lamadline* v. *State,* 303 So. 2d 17 (1974); *Slater* v. *State,* 316 So. 2d 539 (1975); *Swan* v. *State,* 322 So. 2d 485 (1975); *Tedder* v. *State,* 322 So. 2d 908 (1975); *Halliwell* v. *State,* 323 So. 2d 557 (1975); *Thompson* v. *State,* 328 So. 2d 1 (1976); *Messer* v. *State,* 330 So. 2d 137 (1976).

Under Florida's capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances. Thus, in Florida, as in Georgia, it is no longer true that there is " 'no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " *Gregg* v. *Georgia, ante,* at 188, quoting *Furman* v. *Georgia,* 408 U. S., at 313 (WHITE, J., concurring). On its face the Florida system thus satisfies the constitutional deficiencies identified in *Furman.*

## B

As in *Gregg,* the petitioner contends, however, that, while perhaps facially acceptable, the new sentencing procedures in actual effect are merely cosmetic, and that arbitrariness and caprice still pervade the system under which Florida imposes the death penalty.

### (1)

The petitioner first argues that arbitrariness is inherent in the Florida criminal justice system because it allows discretion to be exercised at each stage of a criminal proceeding—the prosecutor's decision whether to charge a capital offense in the first place, his decision whether to accept a plea to a lesser offense, the jury's consideration of lesser included offenses, and, after conviction and unsuccessful appeal, the Executive's decision whether to commute a death sentence. As we noted in *Gregg,* this argument is based on a fundamental misinterpretation of *Furman,* and we reject it for the reasons expressed in *Gregg.* See *ante,* at 199.

### (2)

The petitioner next argues that the new Florida sentencing procedures in reality do not eliminate the arbitrary infliction of death that was condemned in *Furman.* Basically he contends that the statutory aggravating and mitigating circumstances are vague and overbroad,[11] and that the statute gives no guidance as to how the mitigating and aggravating circumstances should be weighed in any specific case.

---

[11] As in *Gregg,* we examine the claims of vagueness and overbreadth in the statutory criteria only insofar as it is necessary to determine whether there is a substantial risk that the Florida capital-sentencing system, when viewed in its entirety, will result in the capricious or arbitrary imposition of the death penalty. See *Gregg* v. *Georgia, ante,* at 201 n. 51.

(a)

Initially the petitioner asserts that the enumerated aggravating and mitigating circumstances are so vague and so broad that virtually "any capital defendant becomes a candidate for the death penalty . . . ." In particular, the petitioner attacks the eighth and third statutory aggravating circumstances, which authorize the death penalty to be imposed if the crime is "especially heinous, atrocious, or cruel," or if "[t]he defendant knowingly created a great risk of death to many persons." §§ 921.141 (5)(h), (c) (Supp. 1976–1977). These provisions must be considered as they have been construed by the Supreme Court of Florida.

That court has recognized that while it is arguable "that all killings are atrocious, . . . [s]till, we believe that the Legislature intended something 'especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder." *Tedder* v. *State*, 322 So. 2d, at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State* v. *Dixon*, 283 So. 2d, at 9. See also *Alford* v. *State*, 307 So. 2d 433, 445 (1975); *Halliwell* v. *State, supra*, at 561.[12] We

---

[12] The Supreme Court of Florida has affirmed death sentences in several cases, including the instant case, where this eighth statutory aggravating factor was found, without specifically stating that the homicide was "pitiless" or "torturous to the victim." See, e. g., *Hallman* v. *State*, 305 So. 2d 180 (1974) (victim's throat slit with broken bottle); *Spinkellink* v. *State*, 313 So. 2d 666 (1975) ("career criminal" shot sleeping traveling companion); *Gardner* v. *State*, 313 So. 2d 675 (1975) (brutal beating and murder); *Alvord* v. *State*, 322 So. 2d 533 (1975) (three women killed by strangulation, one raped); *Douglas* v. *State*, 328 So. 2d 18 (1976) (depraved murder); *Henry* v. *State*, 328 So. 2d 430 (1976) (torture murder); *Dobbert* v. *State*, 328 So. 2d 433 (1976) (torture and killing of two children). But

cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases. See *Gregg* v. *Georgia, ante,* at 200–203.

In the only case, except for the instant case, in which the third aggravating factor—"[t]he defendant knowingly created a great risk of death to many persons"— was found, *Alvord* v. *State,* 322 So. 2d 533 (1975), the State Supreme Court held that the defendant created a great risk of death because he "obviously murdered two of the victims in order to avoid a surviving witness to the [first] murder." *Id.,* at 540.[13] As construed by the Supreme Court of Florida these provisions are not impermissibly vague.[14]

---

the circumstances of all of these cases could accurately be characterized as "pitiless" and "unnecessarily torturous," and it thus does not appear that the Florida Court has abandoned the definition that it announced in *Dixon* and applied in *Alford, Tedder,* and *Halliwell.*

[13] While it might be argued that this case broadens that construction, since only one person other than the victim was attacked at all and then only by being hit with a fist, this would be to read more into the State Supreme Court's opinion than is actually there. That court considered 11 claims of error advanced by the petitioner, including the trial judge's finding that none of the statutory mitigating circumstances existed. It did not, however, consider whether the findings as to each of the statutory aggravating circumstances were supported by the evidence. If only one aggravating circumstance had been found, or if some mitigating circumstance had been found to exist but not to outweigh the aggravating circumstances, we would be justified in concluding that the State Supreme Court had necessarily decided this point even though it had not expressly done so. However, in the circumstances of this case, when four separate aggravating circumstances were found and where each mitigating circumstance was expressly found *not* to exist, no such holding on the part of the State Supreme Court can be implied.

[14] The petitioner notes further that Florida's sentencing system fails to channel the discretion of the jury or judge because it

### (b)

The petitioner next attacks the imprecision of the mitigating circumstances. He argues that whether a defendant acted "under the influence of extreme mental or emotional disturbance," whether a defendant's capacity "to conform his conduct to the requirements of law was substantially impaired," or whether a defendant's participation as an accomplice in a capital felony was "relatively minor," are questions beyond the capacity of a jury or judge to determine. See §§ 921.141 (6)(b), (f), (d) (Supp. 1976–1977).

He also argues that neither a jury nor a judge is capable of deciding how to weigh a defendant's age or determining whether he had a "significant history of prior criminal activity." See §§ 921.141 (6)(g); (a) (Supp. 1976–1977). In a similar vein the petitioner argues that it is not possible to make a rational determination whether there are "sufficient" aggravating circumstances that are not outweighed by the mitigating circumstances, since the state law assigns no specific weight to any of the various circumstances to be considered. See § 921.141 (Supp. 1976–1977).

While these questions and decisions may be hard, they require no more line drawing than is commonly required of a factfinder in a lawsuit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned

---

allows for consideration of nonstatutory aggravating factors. In the only case to approve such a practice, *Sawyer* v. *State*, 313 So. 2d 680 (1975), the Florida court recast the trial court's six nonstatutory aggravating factors into four aggravating circumstances—two of them statutory. As noted earlier, it is unclear that the Florida court would ever approve a death sentence based entirely on nonstatutory aggravating circumstances. See n. 8, *supra*.

mitigating circumstances. While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.

### (c)

Finally, the Florida statute has a provision designed to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants. The Supreme Court of Florida reviews each death sentence to ensure that similar results are reached in similar cases.[15]

Nonetheless the petitioner attacks the Florida appellate review process because the role of the Supreme Court of Florida in reviewing death sentences is necessarily subjective and unpredictable. While it may be true that that court has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary. In fact, it is apparent that the Florida court has undertaken responsibly to perform its function of death sentence review with a maximum of

---

[15] *State* v. *Dixon,* 283 So. 2d, at 10.

rationality and consistency. For example, it has several times compared the circumstances of a case under review with those of previous cases in which it has assessed the imposition of death sentences. See, *e. g., Alford* v. *State*, 307 So. 2d, at 445; *Alvord* v. *State*, 322 So. 2d, at 540–541. By following this procedure the Florida court has in effect adopted the type of proportionality review mandated by the Georgia statute. Cf. *Gregg* v. *Georgia, ante,* at 204–206. And any suggestion that the Florida court engages in only cursory or rubber-stamp review of death penalty cases is totally controverted by the fact that it has vacated over one-third of the death sentences that have come before it. See *supra,* at 253.[16]

## IV

Florida, like Georgia, has responded to *Furman* by enacting legislation that passes constitutional muster. That legislation provides that after a person is convicted of first-degree murder, there shall be an informed, focused, guided, and objective inquiry into the question whether he should be sentenced to death. If a death sentence is imposed, the sentencing authority articulates in writing the statutory reasons that led to its decision. Those reasons, and the evidence supporting them, are conscientiously reviewed by a court which, because of

---

[16] The petitioner also argues that since the Florida Court does not review sentences of life imprisonment imposed in capital cases or sentences imposed in cases where a capital crime was charged but where the jury convicted of a lesser offense, it will have an unbalanced view of the way that the typical jury treats a murder case and it will affirm death sentences under circumstances where the vast majority of judges would have imposed a sentence of life imprisonment. As we noted in *Gregg* v. *Georgia, ante,* at 204 n. 56, this problem is not sufficient to raise a serious risk that the state capital-sentencing system will result in arbitrary and capricious imposition of the death penalty.

its statewide jurisdiction, can assure consistency, fairness, and rationality in the evenhanded operation of the state law. As in Georgia, this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed. See *Furman* v. *Georgia,* 408 U. S., at 310 (STEWART, J., concurring). Accordingly, the judgment before us is affirmed.

*It is so ordered.*

[For dissenting opinion of MR. JUSTICE BRENNAN, see *ante,* p. 227.]

[For dissenting opinion of MR. JUSTICE MARSHALL, see *ante,* p. 231.]

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment.

There is no need to repeat the statement of the facts of this case and of the statutory procedure under which the death penalty was imposed, both of which are described in detail in the opinion of MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS. I agree with them, see Parts III–B (2)(a) and (b), *ante,* at 255–258, that although the statutory aggravating and mitigating circumstances are not susceptible of mechanical application, they are by no means so vague and overbroad as to leave the discretion of the sentencing authority unfettered. Under Florida law, the sentencing judge is *required* to impose the death penalty on all first-degree murderers as to whom the statutory aggravating factors outweigh the mitigating factors. There is good reason to anticipate, then, that as to certain categories of murderers, the penalty will not be imposed freakishly or rarely but will be imposed with regularity; and consequently it cannot be said that the death penalty in

Florida as to those categories has ceased "to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system." *Furman* v. *Georgia,* 408 U. S. 238, 311 (1972) (WHITE, J., concurring). Accordingly, the Florida statutory scheme for imposing the death penalty does not run afoul of this Court's holding in *Furman* v. *Georgia.*

For the reasons set forth in my opinion concurring in the judgment in *Gregg* v. *Georgia, ante,* at 224–225, and my dissenting opinion in *Roberts* v. *Louisiana, post,* at 348–350, this conclusion is not undercut by the possibility that some murderers may escape the death penalty solely through exercise of prosecutorial discretion or executive clemency. For the reasons set forth in my dissenting opinion in *Roberts* v. *Louisiana, post,* at 350–356, I also reject petitioner's argument that under the Eighth Amendment the death penalty may never be imposed under any circumstances.

I concur in the judgment of affirmance.

MR. JUSTICE BLACKMUN, concurring in the judgment.

I concur in the judgment. See *Furman* v. *Georgia,* 408 U. S. 238, 405–414 (1972) (BLACKMUN, J., dissenting), and *id.,* at 375, 414, and 465.